KLIEBERT, Judge.
F.W. Woolworth Company and its workmen’s compensation insurer, Travelers Insurance Company (defendants) bring this suspensive appeal from a judgment finding Brenda Gullage (plaintiff) totally and permanently disabled as a result of a work related injury and awarding weekly compensation benefits. Plaintiff cross-appeals from that portion of the judgment denying her request for penalties and attorney’s fees. We affirm the judgment of the trial court.
Plaintiff injured her back on October 21, 1982 when she attempted to pull a box of canned hams from a stock of provisions in the storeroom at her place of employment, the Woolco Store in Boutte. At the time of her injury, the 37 year old plaintiff was employed as a sales clerk earning an average weekly wage of $140.00. Plaintiff’s duties included stocking shelves in the candy/stationary area of the store.
Plaintiff continued to work on the date of the accident, soaked in hot water that night, returned to work the next day and, *78 because her pain worsened, saw Dr. Thurman Phemister, a general practitioner, who prescribed a pain killer and muscle relaxant and ordered her to receive physical therapy for one week.
At the commencement of the trial it was stipulated: (1) Travelers Insurance Company had in effect on the date of the accident a worker’s compensation insurance policy; (2) the accident was within the course and scope of plaintiffs employment; and (3) if plaintiff was presently disabled as a result of the accident, there would be coverage under the policy. It was further stipulated that benefits had been paid from the date of the accident with the last payment for the week ending May 2, 1985 being made on April 26, 1985. In light of the stipulation the only issues at trial were the existence of a disability, the extent thereof and the applicability of penalties and attorney fees due to termination of benefit payments.
Ms. Gullage saw Dr. Monica Vial Benson,[1] a physiatrist, her primary treating physician, for the first time on November 2,1982. In the course of her treatment Dr. Benson referred plaintiff to Dr. John Jackson, a neurosurgeon, and to Dr. Harry F. Davis, Associate Medical Director of the Touro Infirmary Center for Chronic Pain. Although Dr. Davis felt plaintiff was an appropriate subject for the program, she did not attend. Plaintiff was also evaluated on her own initiative by Dr. Charles Billings, an orthopedist, and at the request of the defendants, by Dr. William J. Johnston, Jr., a neurosurgeon.
Dr. Benson was the only physician to personally appear at trial. The depositions of Dr. Jackson and Dr. Johnston were introduced by the defendants. Additionally, medical reports issued over a four year period by the doctors involved in treating and/or evaluating the plaintiff’s injuries as well as hospital records and test results were introduced. Also testifying at trial were the plaintiff and Mr. Joseph Albe, a claims supervisor for Travelers Insurance Company.
Based on the medical evidence submitted, the trial judge concluded Ms. Gullage “... has an on-going disability caused by the accident of October 21, 1982 and she continues to be entitled to total and permanent worker’s compensation disability benefits.” The appellants contend “... the record does not support the findings of a nerve stretch injury and in fact suggest non-accident related factors as the cause of Ms. Gullage’s present condition. ”
The trial judge summed up her view of medical treatments, views and opinions contained in the record in her reasons for judgment, and after careful review of the record we adopt the trial judge’s following summation as our own:
“On November 2,1982 she was Dr. Monica Vial Benson, a physiatrist, who changed her medication, prescribed moist heat, ultrasound and daily massage. On November 15, pelvic traction was added to the regimen. On November 17, an EMG was performed which showed poly-radiculopathy. She was admitted to St. Charles Hospital for a complete diagnostic workup. A myelogram and CT Scan were performed, both of which were within normal limits.
“Dr. Benson continued treatment until February 28, 1983 when, because of her failure to improve, she referred Gullage to Dr. John Jackson, a neurosurgeon. Dr. John Jackson testified by deposition on July 10, 1984 that he saw plaintiff on February 28, 1983, complaining of low back pain and pain radiating into the right hip, thigh and lower extremity down to the right foot, and an occasional pain in the left lower extremity. On that date his neurological examination revealed decreased sensation over the right lateral foot and third toe, fair range of *79 motion of lumbar spine, straight leg raising to 90 degrees bilaterally without pain. She walked with a ‘peculiar gait.’ He examined prior cervical and lumbar spine x-rays, the lumbar myelogram, and the CT Scan, which he found normal. He concluded her condition to be basically normal from an organic neurological standpoint and suggested her condition revealed ‘a great deal of psychological overlay.’ He suggested she start an exercise program which he hoped, along with the passage of time, would help overcome her complaints.
Dr. Benson continued seeing her at regular intervals and treating her with medication, physical therapy, heat, ice and traction.
Her attorney referred her to Dr. C. Billings, an orthopedist, who admitted her to Hotel Dieu on June 6, 1983 for a disco-gram. Gullage was hospitalized from June 6 through June 21, 1983. On admission Dr. Billings’ impression was stated as ‘suspected lumbar disc disease.’ Dr. Billings’ report on that hospitalization follows:
‘Ms. Gullage was admitted to Hotel Dieu Hospital in New Orleans where completion of her lumbar spine evaluation was performed. Bone scanning disclosed no significant uptake in the lumbar spine region. Lumbar discography was performed at the L3-4, L4-5, and L5-S1 levels. There was no evidence of significant disc abnormality. Lumbar facet joint injections were carried out which initially seemed to provide the patient with some improvement in her discomfort.’
She returned to Dr. Benson, who continued conservative treatment and medication. On October 6, 1983 she was referred by Dr. Benson to the Touro Center for Chronic Pain. She was evaluated and although recommended for admission into the program, did not receive treatment because the insurer refused to pay.
Dr. Jackson saw her again on January 9, 1984. She reported having a negative discogram and a negative bone scan. On that date the neurological exam revealed that ‘the deep tendon reflexes in the lower extremities were equal but hypoactive bilaterally.’ She had decreased sensation over the right large toe. She still walked with a ‘peculiar gait.’ Since she appeared to be getting worse, and since Dr. Jackson wasn’t satisfied with the prior CT Scan, he suggested another CT Scan be performed.
Dr. Jackson saw her again on April 5, 1984, at which time she had difficulty walking. She used two' canes because her lower extremities had become so weak. He recommended her admission to Lakeside Hospital for a discogram based on her serious complaints and on the findings of 3/15/84 CT Scan at East Jefferson, which had revealed a mild central posterior bulge of the L-5, S-l disc. The discogram was ordered to determine the extensiveness of the bulge. The dis-cogram was performed and it was normal. His opinion as to the psychological overlay was reinforced.
On February 28, 1985 she was admitted to Lakeside Hospital for a repeat lumbar discogram. Results of the test indicate there was no bulging disc that impinged on nerve roots. The examining physician, Dr. Keating, described it as an ‘equivocal disc.’
Dr. Jackson became suspicious that she may have a spinal cord tumor and therefore repeated the myelogram and another CT Scan. He decided she had no disc disease and recommended a weight reducing program and physical therapy. Significantly, Gullage lost twenty pounds within the next few months.
In April, 1985 Dr. Benson prescribed a transcutaneous nerve stimulation unit which gave Gullage intermittent relief. On May 2, 1985 she revisited Dr. Jackson, continuing to complain of low back pain and relating the new symptom of radiating pain in the right arm with some radiation into the center of the thoracic spine posteriorly. He again suggested testing to determine the extent of psychological overlay.
*80 Her last visit to Dr. Jackson was on June 28, 1985. A Magnetic Resining Imaging test revealed some decrease in disc space height at the L4-5 level. He categorized this as 'SchmorPs deformity,’ which he did not feel was the cause of the severe pain, nor a result of the injury. He found no objective neurological reasons why she could not return to work.
Dr. Jackson concludes with 99 percent certainty that Gullage does not have structural damage causing her pain. He does, however, confirm she had a radicu-lopathy.
Dr. William J. Johnston, Jr., a neurosurgeon, testified by deposition. Gullage was seen by him at the request of the insurer. He reported no objective findings to indicate organic pathology.
Dr. Benson concludes the injury is a nerve stretch injury which she suggests would be consistent with the negative discograms, myelograms, and CT Scans (which only reveal structural damage) and the positive EMG and continued pain and disability.
Based on the summation of the medical evidence the trial judge concluded that since neither Dr. Jackson nor Dr. Johnston was asked whether a nerve stretch injury could produce the symptoms plaintiff continued to exhibit almost four years after the accident and whether such an injury would evade detection on the battery of tests plaintiff underwent, Dr. Benson’s final diagnosis was unrefuted on the record.
The appellant challenges the trial court’s conclusion. He argues that Dr. Benson’s diagnosis is based solely on two abnormal EMG findings and that throughout the course of treatment Dr. Benson maintained that Ms. Gullage had a ruptured disc and points to her referral to Dr. Jackson for a neurological examination, testing and surgery if it was indicated as supportive of his contention. He argues it was not until Dr. Benson handed appellant counsel her medical records and testified in court that Dr. Benson expressed the view Ms. Gullage’s injury was a “nerve stretch injury” and implies that theretofore Dr. Benson’s diagnosis was a disc problem.
The record is at variance with appellant counsel’s contentions. We note that by letter dated November 11, 1988, Dr. Benson informed defendants Ms. Gullage might be suffering from a stretch injury as no disc problems were discovered. (See Yol. Ill, R.p. 561) Thus, contrary to appellant counsel’s contentions, Dr. Benson’s trial testimony that she reached the conclusion Ms. Gullage had a “stretch nerve injury” by the process of elimination was totally consistent with the observations and diagnosis she had previously expressed.
We note also that Dr. Benson last examined Ms. Gullage on June 11, 1985 and in summing up Ms. Gullage’s case history noted extensive conservative treatment and multiple trials of different modalities including transcutaneous nerve stimulation, traction, heat, and cold therapy as well as drug therapy. She observed that various tests ruled out disc problems, tumors, arthritis or structual causes. She was impressed with the fact Ms. Gullage had voluntarily sought a second discogram despite knowing it was a painful procedure. Based on this and her view that both EMG’s she conducted showed evidence of nerve damage, she concluded Ms. Gullage was suffering from a nerve stretch injury, i.e., a tear on the nerve which caused some fibers to completely die. In her opinion Ms. Gullage had an ongoing physical disability originating from her employment at Woolco and was at the time of trial unfit for a job requiring heavy lifting.
At the time of trial Ms. Gullage was still complaining of back pain and numbness in the lower extremities, and at the time of her last examination by Dr. Benson, there was evidence of muscle spasm in the lumbar region. Dr. Benson felt Ms. Gullage would benefit greatly from future treatment at a pain clinic and if necessary, further procedures such as dorsal root rhizoto-my.
In brief defendants aver the testimony of Dr. Jackson and Dr. Johnston is entitled to greater weight than that of Dr. Benson in *81 that they are specialists, i.e., “nerve doctors.” They further aver that plaintiff did not establish the existence of a disability by a preponderance of evidence.
We first note that Dr. Benson is a specialist in physical medicine and rehabilitation, which she defined as the use of physical modalities in the treatment of diseased processes in conjunction with medicines, if necessary. She explained there is some interfacing between physiatry, orthopedics, neurosurgery and neurology and that her primary goal is treating pathology of the spine. Dr. Benson was accepted as an expert in the field of physiatry. Dr. Johnson explained that physiatry is a separate specialty which often interfaces with neurological surgery in the sense that phy-siatrists are trained to assess and plan for the rehabilitation of a patient from a given injury or illness, including the performance of EMG’s, which may reveal the existence of radiculopathy. As Dr. Benson was a specialist in the treatment of pathology of the spine, her testimony was entitled to equal weight. Further, Dr. Benson treated plaintiff over a four year period and was aware of her history. Dr. Benson had many more opportunities to observe the plaintiff than the other doctors. As primary treating physician, her testimony can be given greater weight than that of specialists who had only limited contact with the plaintiff. Randall v. St. Paul Fire and Marine Ins. Co., 470 So.2d 301 (La.App. 5th Cir.1985); Williams v. Liberty Mutual Ins. Company, 327 So.2d 462 (La.App. 3rd Cir.1976).
Under the law applicable to this case, if plaintiff was shown to be totally disabled at the time of trial and the disability is of indefinite or indeterminate duration, she was entitled to permanent benefits as opposed to temporary benefits. Walker v. Gaines P. Wilson & Son, Inc., 340 So.2d 985, 987 (La.1976); Sharbono v. H & S Const. Co., 478 So.2d 779 (La.App. 3rd Cir.1985).[2]
When an employee is unable to perform the duties necessary to any gainful employment or can only perform them in substantial pain as a result of a work related injury, said employee is totally disabled for purposes of workmen’s compensation. Sharbono, supra; Randall, supra. Whether a plaintiff’s pain is substantial enough to render him disabled is a factual determination for the trier of fact. Randall, supra; Ellis v. Rapides Parish School Board, 419 So.2d 990 (La.App. 3rd Cir.1982).
Dr. Benson testified plaintiff was not fit for employment in a job requiring lifting heavy objects and boxes. Although Dr. Jackson and Dr. Johnston testified that in their view plaintiff could return to work, both based their opinion on the absence of objective symptoms (structural damage) despite extensive electrodiagnostic testing. However, neither doctor could or would say plaintiff was not in pain and both acknowledged the abnormal results of the EMG’s conducted by Dr. Benson suggested the existence of a radiculopathy. Defendants point out that Dr. Jackson felt “a great deal of this patient’s complaints are of a psychological basis rather than an organic neurological basis...” However, in Jordan v. Southern Natural Gas Co., 455 So.2d 1217, 1222 (La.App. 2nd Cir.1984), the court stated:
*82 .. mental disabilities have been held to be compensable under the act when certain circumstances are present. See Faucheux v. Hooker Chemical Corp., 440 So.2d 1377 (La.App. 5th Cir.1983) and the cases cited therein. This condition must be proven as in any other disabling injury, by a preponderance of the evidence. Such a condition must not only be shown to exist but also it must be shown that the condition was causally related to a work related accident. Faucheux v. Hooker Chemical Corp., supra; Andrus v. Rimmer and Garrett, Inc., 316 So.2d 433 (La.App. 3d Cir.1975). Therefore, it is clear under the present state of the law that when a plaintiff develops a disabling anxiety syndrome, traumatic neurosis, or other mental disorder as a result of a work related physical injury, he can recover compensation benefits even if he has recovered physically from the injury. The rationale behind such recovery is that nervousness, neurosis, or emotional disturbances, superinduced by the worker having suffered an injury, can be just as devastating to the ability to return to work as physical or anatomical injuries. Faucheux v. Hooker Chemical Corp., supra.”
In Dr. Benson’s opinion the radiculopa-thy was traumatically caused. Although defendants aver the radiculopathy may have been caused by a virus, diabetes or other metabolic reasons, they overlook the fact that no evidence of nontraumatic causation was introduced and the radiculopa-thy was discovered less than one month after plaintiff’s first complaint of injury. At no point in the interim period had plaintiff’s complaints subsided.
Plaintiff testified she was a high school graduate with no specialized skills or vocational training. Prior to employment by Woolco, plaintiff was employed by various janitorial services as a laborer. She had no previous problems with back pain. Plaintiff related she was still having a lot of pain in her lower back and leg and desired further medical attention but had been unable to afford it.
In evaluating evidence the trier of fact should accept as true the uncontradicted testimony of a plaintiff witness absent a sound reason for its rejection. Robertson v. Scanio Produce and Institutional Foods, Inc., 449 So.2d 459 (La.1984); Randall, supra. As noted in Tantillo v. Liberty Mutual Insurance Company, 315 So.2d 743, 748-749 (La.1975):
“... Great weight, almost to the point of exclusion of other evidence, is given to uncontradicted medical evidence which is directed toward a complex scientific question. However, in all cases, it is the judge’s function to determine the weight which is to be accorded the medical testimony as well as the lay testimony. Lay testimony has great probative value in establishing certain facts, such as the existence and location of pain and the actual ability or inability of a claimant to perform certain physical functions or to pursue his regular employment...”
The workmen’s compensation law must be liberally interpreted in favor of the injured worker, and its beneficial purposes are best served when great weight is given to a trial court’s determination that an employee is disabled. Johnson v. Insurance Company of North America, 454 So.2d 1113 (La.1984); Randall, supra. The trial judge found the plaintiff was totally and permanently disabled. Such a factual determination should not be disturbed on appeal when there is evidence before the judge which, upon his reasonable evaluation of credibility, furnishes a reasonable factual basis for such finding, unless such finding is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Randall, supra. We cannot say the trial judge was clearly wrong in finding plaintiff totally and permanently disabled.
By cross-appeal, plaintiff avers the trial judge erred in failing to award penalties and attorney’s fees and further requests reasonable attorney’s fees for this appeal. Plaintiff contends that the termination of *83 benefits was arbitrary, capricious and unreasonable and that the present appeal is filed on specious grounds, serving only to deprive her of rightful benefits.
Under the law applicable to this case, a compensation insurer is liable for a twelve percent penalty plus “reasonable” attorney fees for the collection of unpaid compensation to which an employee is legally entitled, should the insurer fail to pay the claim within sixty days of demand, provided the refusal to pay is “arbitrary, capricious, or without probable cause.” La.R.S. 22:658;[3] now see 23:1201.2.
The determination of whether an insurer was arbitrary in terminating benefits is a factual issue and should not be disturbed unless it is manifestly erroneous. Randall, supra; Richard v. Standard Fittings, 379 So.2d 33 (3rd Cir.1979). Further, employers are not to be penalized for taking a case to court for judicial resolution of close factual questions, even though subsequent litigation results in an adverse decision. Clakeley v. Ochsner Foundation Hosp., 478 So.2d 1335 (5th Cir.1985); Olsen, supra.
Defendants cut off benefits because extensive electrodiagnostic testing revealed no structural defects in plaintiffs spine and neither Dr. Johnston nor Dr. Jackson found objective evidence of organic pathology. Both doctors advised the insurer that plaintiff could return to work. In light of these facts, we find the trial judge was not manifestly in error in refusing to award penalties and attorney’s fees.
Accordingly, we affirm the trial court’s judgment. All costs are to be borne by the appellants.
AFFIRMED.

. Dr. Benson’s specialty is in physiatry as opposed to psychiatry. Her expertise is in the treatment of physical illness and rehabilitation as opposed to the treatment of mental illness. She describes physiatry as a relatively new specialty which can be described as a combination of orthopedics, neurosurgery and neurology, except that treatment is by physical means and medicine as opposed to surgery.

. The Sharbono court noted at p. 785, n.l:
"The rule has since been changed by legislation. Footnote 2 in Olson v. Ins. Co. of State of Pa., 471 So.2d 1151, at page 1154-1155 [La.App. 3rd Cir.1985], noted that: *The 1983 amendments [effective July 1, 1983] to the workers' compensation statutes legislatively overrule this facet of our jurisprudence. Under the new law, the worker must prove, *by clear and convincing evidence, unaided by any presumption of disability,’ that the total disability is permanent. La.Rev.Stat. 23:1221(2)(c). A recent case interpreting this statutory provision opines that, in cases analogous to the present, the worker would be entitled to temporary total disability benefits, with the possibility of amending the judgment pursuant to Louisiana Revised Statute 23:1331, should the recovery of the worker not occur. Brewster v. Manville Forest Products Corp., 469 So.2d 340, 344-346 (La.App. 2d Cir. May 8, 1985)."

. In Olson v. Ins. Co. of State of Pa., 471 So.2d 1151, 1155 (3rd Cir.1985) the court noted:
“The 1983 amendments to the workers’ compensation statutes have ended the utility of section 658 for compensation cases. As amended, Louisiana Revised Statute 23:1201.2 governs the issue of arbitrary and capricious late- or non-payment for both insurers and uninsured employers. Section 1201.2 prohibits the use of revised statute 22.658 in worker’s compensation cases, and section 1201.2 does not provide for penalties, only for attorney fees. See Mallet v. La. Nursing Homes, Inc., 459 So.2d 178, 181 n. 2 (La.App. 3d Cir.1984).”